**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | Case No.: 3:22-CR-163-RJC-DCK |
| v. | ) | |
| | ) | |
| TAWAAN BATTEN, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **DISCLOSURE OF THE** |
| | ) | **PRESENTENCE .** |
| | ) | **INVESTIGATION REPORT** |
| | ) | **AND OTHER** |
| | ) | **CONSTIUIONALLY REQURED** |
| | ) | **DISCLOSURES OF** |
| | ) | **INFORMATION REGARDING** |
| | ) | **KRISTI HEATHER KING** |
| | ) | |
| _____ | ) | |

Now Comes the defendant, Tawaan Batten (Mr. Batten), by and through undersigned

Counsel, pursuant to Federal Rule of Criminal Procedure 5(f), *Brady v. Maryland*, 373 U.S. 83

(1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and respectfully requests the Court to

order the disclosure of the Presentence Investigation Report (PSR) for Mr. Batten's co-

defendant, Kristi Hearther King (King) and other constitutionally required disclosures. Those

disclosures, in addition to King's PSR, include the following materials that are critical to Mr.

Batten's right to a sentence that is "sufficient but not greater than necessary" to achieve the

purposes of sentencing as set forth in 18 U.S.C. § 3553((a)(2):

A.    King's final PSR issued on February 14, 2021. Dkt. No. 21;

B.    King's motions for bond and/or review of the conditions for release;

C.    Any and all statements and correspondence between the Government and King,
      whether directly to or by King or to or by King's counsel subsequent to the
      Government's interview with King in advance of the trial of this case.

D.     Any and all plea agreements offered to Defendant Kristi Heather King prior to the final agreement signed on November 7, 2023 and filed with the Court on November 8, 2023;

E.     Any and all proffer agreements including but not limited to Agreements to Provide Truthful Testimony and/or immunity agreements by whatever name is given to the document (i.e.. Queen for a Day Letter," "Non-Attribution Agreement," "Informal Immunity Agreement") concerning King;

F.     Any and all proffers of testimony by King, individually or through her attorney to the Government, whether in writing or orally;

G.     Any and all statements made to counsel for King that are inconsistent with statements made to the Government and/or made under oath during the trial of this case;

H.     Evidence of any and all discussions between the Government and King, individually or through her attorney, whether in writing or orally, regarding potential motions for a sentence reduction pursuant to United States Sentencing Guideline 5K1.1 based on King's cooperation, assistance and testimony in the prosecution of Mr. Batten;

I.     Any and all agreements between the Government and BT (identity protected) to forego prosecution and/or referral to the State of North Carolina for prosecution in return for her assistance and testimony in the prosecution of Mr. Batten;

J.     Any and all statements made by King to Dr. Chitra Raghavan, PHD on August 21 and August 22, 2023 in the performance of a psychological evaluation of King.

## PROCEDURAL BACKGROUND

On June 22, 2022, King was charged alone in a one-count Bill of Indictment with sex trafficking of a minor, in violation of 18 U.S.C. §1591(a)(1), (b)(2) and (c).  Case No. 3:22-cr-163, Dkt. No. 1.  She faced a statutory minimum sentence of ten years and a statutory maximum of life in prison pursuant to Section 1951(b)(2).

King was arrested and made her initial appearance on the charge on July 6, 2022.  Minute Docket Entry Dated July 6, 2022. During the subsequent hearing, held on July 11, 2022,  the Government proffered the following information in support of its motion for King's detention:

She's facing, at the very least, 10 years of imprisonment all the way up to life for this charge. Looking at the nature and circumstances of this offense, the evidence shows that *the defendant was arranging commercial-sex transactions* for the minor victim from mid-July to September of 2021 and again briefly in December of 2021 in Charlotte and Fort Mill. The minor victim in this case was 15 years old at the time and was reported missing at the end of June of 2021. She reported that the defendant's boyfriend would keep the cash payments from customers, and *the defendant would keep the Cash App payments*.

*        *        *

When the FBI arrived, they saw the defendant and her boyfriend sitting outside of the hotel entrance, and *they saw the defendant using the cellphone* during the same timeframe that the undercover was texting the advertisement number.

*        *        *

[The FBI] obtained search warrants Case 3:22-cr-00163-RJC-DCK Document 12 Filed 08/09/22 Page 4 of 19  for the victim and defendant's FaceBook accounts, where they found messages from mid-July to September showing that *the defendant was arranging commercial-sex transactions* with customers for the victim and then relaying the arrangement to the victim. [The FBI] also found that some customers would pay *the defendant's Cash App account.*

*        *        *

[The victim] reported that the defendant took some of her pictures used for commercial-sex advertisements and that the defendant posted some of her advertisements.

*        *        *

[The victim] said that customers would sometimes pay through Cash App, and, when they did it, they sent it to the defendant's account and that the defendant would keep that money.

*        *        *

[T]he victim's commercial-sex advertisements posted on [the Megapersonal] Web site, show that an account with the defendant's email -- that's also her registered email for her FaceBook -- posted

> advertisements of the victim on August 9th, 10th, and 11th, August 23rd through 25th, August 30th through 31st, and September 1st and 2nd of 2021.

Dkt. No. 12, pp. 3-12 (emphasis added).

The Government also proffered that evidence obtained during the investigation of King showed that she rented a hotel room for the victim from July 19, through July 21st of 2022. The Government also told the Court that King sent a customer to the address of the room to have sex with the minor victim and that King received the payment for the victim's services through her Cash App account. *Id*. p. 12.

Based on this proffer, the Government asserted that "the evidence is strong that she is a danger, as well as a flight risk, and that she cannot overcome the presumption here, so we are asking that she be detained." *Id*. at p. 13. Despite King's arguments, the Magistrate Judge found that King was both a flight risk and a danger to the community and ordered her detained pending trial. Dkt. No. 9, p. 2.

On August 2, 2022, King filed a motion for bond arguing that she had received discovery from the Government that was unavailable at the original detention hearing. Dkt. Nos. 13, 14. According to King, she was in an abusive relationship with Mr. Batten and was as much a victim as the underage girl she was charged with trafficking for sex. "The discovery now reveals that Heather was an abused and frightened sex trafficking victim and was trying to rescue both herself and participating in [the minor victim's]s sex trafficking only to the extent that she was coerced by Batten, and trying to keep as safe as she could." Dkt. 13, p. 6.

On August 30, 2022 the Government filed a blistering response in which it laid out compelling evidence that King was a full-fledged partner with Mr. Batten in sex trafficking the underage girl. Dkt. No. 15. Indeed, the Government actually argued that King was primarily

responsible for trafficking the actual victim and argued that it was King who controlled Mr. Batten rather than the other way around:

> The evidence is clear that the defendant took an active role in sex trafficking the fifteen year-old victim. Further, instead of seizing opportunities to stop what she was doing and leave the scheme, she continued to provide and maintain the minor victim for commercial sex.

According to the Government, King's conduct was the "standard  behavior of a sex trafficker who is exploiting a vulnerable victim."  Dkt. No. 15, p. 2.  The Government cited several examples of King's participation in the sex trafficking of the minor victim including providing clothes and supplies to the victim, taking pictures of the victim to be used in commercial sex advertisements, posting those advertisements, and arranging for customers to meet with the victim for sexual activities.  *Id*.

The Government also asserted that the evidence showed that "[o]n numerous days, [King]  was instrumental in arranging commercial sex transactions for the minor victim" by texting with the customers and "relaying the price and timeframe to the minor victim.  Dkt. No.15, p.  3.  The Government stated that its evidence demonstrated that King "was an active participant in promoting the commercial sex work of others, like the minor victim, and not merely a passive and unwilling participant operating under duress" –  and that her "interest centered on the execution of the sex trafficking scheme and exploitation of the minor victim." *Id*. at 4, 5.

On September 7, 2022, the Magistrate Judge denied the motion for bond in a Text Only Order.  On September 19, 2022, King filed a motion for review of the Magistrate Judge's detention order arguing once again that King was as an abused victim rather than a participant in the sex trafficking of a minor.  Dkt. No. 20.

This Court denied the defense motion on November 16, 2022. Dkt. No. 29. However, the Court's Order was also filed under seal. *Id*.

On November 15, 2022, King was charged along with Mr. Batten in a superseding indictment. Dkt. No. 28.[1] She was charged with conspiracy to sex traffic a minor, in violation of 18 U.S.C. § 1954, a substantive count of sex trafficking a minor, in violation of 18 U.S.C. § 1951(a)(1), (b)(2), and (c), and one count of transporting a minor for purposes of engaging in sexual activities, in violation of 18 U.S.C. § 2423(a) with Mr. Batten. Dkt. No. 28. But King was also charged alone with a second count of transporting a minor for the purpose of engaging in sexual activities. *Id*. at p. 2.

On August 21 and 22, 2023, King was evaluated by psychologist Dr. Chitra Raghavan. Based on interviews and psychological tests given over that two-day period, Raghavan issued a report on October 30, 2023 in which she opined that "King was a casualty of Mr. Batten's violence and exploitation, and a pawn in his alleged sex trafficking activities rather than an accomplice."

Notwithstanding her "casualty" status, eight days later on November 7, 2023, King signed a plea agreement with the Government. Case No. 3:23-245-RJC, Dkt. No. 2. King was permitted to plead to a Bill of Information alleging a violation of 18 U.S.C. § 371 (Dkt. No. 5) rather than any of the counts in the Superseding Indictment in which she was charged with Mr. Batten.

But a comparison of the language in the Section 371 conspiracy count is virtually identical to the conspiracy count in the Superseding Indictment as well as the language in the

---

[1] Mr. Batten was arrested on November 17, 2022, Following a detention hearing on November 23, 2022, Mr. Batten was ordered detained pending trial. He has been in custody since that date.

substantive count of sex trafficking a minor. The only difference between the indicted charge and the charge that King pled guilty to was the amount of time she faced.

Based on the charges in the indictment, King was facing a mandatory minimum of ten years in prison with a statutory maximum of life. But King was permitted by the Government to plead guilty to an offense with a statutory maximum of five years in prison with no mandatory minimum sentence.

The Plea Agreement was silent as to any applicable enhancements. Dkt. No. 2, p.2. In fact, rather than require any stipulations as to applicable enhancements, the Agreement allowed King to argue her position "regarding any other specific offense characteristics, cross-references, special instructions, reductions, enhancements, departures, and adjustments to the offense level." *Id*.

However, the Factual Basis filed with the Plea Agreement makes it clear that King was an equal partner with Mr. Batten in the sex trafficking of an underage girl. Dkt. No. 3. In fact, like the Superseding Indictment, the Factual Basis alleges that King's conduct was worse than Mr. Batten's because she transported the underage girl for commercial sex acts on two separate occasions whereas Mr. Batten was only charged with one transportation count. *Id*.

But even prior to her guilty plea, the Government notified King's attorneys that it was open to considering a bond" that would allow King who had been facing a mandatory minimum sentence of ten years to life to be free on bond. And the Government was more than open to the idea.

On January 12, 2024 King filed a motion for release on bond. Dkt. No. 10. Because it was filed under seal, it is unknown whether the motion was opposed or agreed to by the Government. But the Government did not file a formal objection to King's motion and

following a hearing on November 17, 2023, King was released on a $25,000 unsecured bond. Dkt. No. 11.  Mr. Batten remained in custody.

A draft of King's PSR was issued on January 5, 2023.  Dkt. No. 9.  King did not file any objections to the PSR but on January 16, 2023, the Government filed what is identified as an objection to the PSR.  Dkt. No. 16.  Whether the Government was seeking an increase or a decrease in the Guidelines calculation recommended by the Probation Officer is unknown because the objection was filed under seal.  *Id*.  But King did not respond to the Government's objection.

On October 28, 2024, King filed a motion for a bond review hearing.  Dkt.  No. 24. Because the motion was filed under seal, the Government's position on the motion is unknown and the Government did not file a response.  However, the Government joined with King at the hearing and recommended that she be permitted to remain on bond under the same conditions previously set by the Magistrate Judge.  Minute Entry Dated 11/5/2024.

Mr. Batten elected to exercise his right to trial which began on December 11, 2023.  The jury returned a verdict of guilty on all counts on December 13, 2023.  Sentencing is presently set for January 21, 2025.

## ARGUMENT

A.   <u>Mr. Batten is entitled to review King's PSR in its entirety</u>

In *Brady v. Maryland*, *supra* the Supreme Court held that the Government is required to disclose all evidence favorable to the accused that is material to guilt or punishment.  And that the suppression of such material evidence warrants a new trial.  373 U.S. at 87.  Subsequently, the Court held that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule."

*Giglio*, 405 U.S. at 154. Evidence is material if there is a reasonable probability that it will affect the proceeding. *United States v. Baagley*, 473 U.S. 667, 682 (1985).

Moreover, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case. . .". *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). And a constitutional violation is established where the cumulative effect of the withheld evidence establishes a reasonable probability that the outcome of the proceeding would have been different. *Id*. at 434-37. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.).

Congress has recently reiterated the importance of disclosing all information that is favorable to an accused or may undermine the Government's case in the Due Process Protection Act, now embodied in Rule 5(f), Fed. R. Crim. Pro. Now, at every initial appearance in this District, including the initial appearance for Mr. Batten, the Magistrate Judge issues the following Order:

> Pursuant to Rule 5(f) of the Federal Rules of Criminal Procedure, the Court confirms the obligation of the Government to disclose to the defendant *all exculpatory evidence that is, evidence that favors the defendant or casts doubt on the case brought by the Governm*ent under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and ORDERS the Government to comply with this obligation. The Government is advised that failure to disclose exculpatory evidence in a timely manner may result in the exclusion of evidence, dismissal of charges, contempt proceedings, disciplinary actions, or other sanctions, as may be appropriate.

Dkt. No. 36 (emphasis added).

The Government's obligations under *Brady* and its progeny apply with equal force to both the guilt and sentencing phases of a case. Indeed, the Supreme Court specifically held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 87. *See also Basden v. Lee*, 290

F.3d 602, 611 (4th Cir. 2002) (finding state argument that *Brady* did not apply to sentencing hearings "meritless.").

Mr. Batten submits that King's PSR contains *Brady* and *Giglio* material and must be disclosed prior to the sentencing hearing in this case. Mr. Batten has not requested the Government to provide a copy of King's PSR because of the rules requiring that PSRs remain confidential and under seal. *See United States v. Figurski*, 545 F.2d 389, 391 (4th Cir. 1976) ("[I]information contained in a presentence report should not be disclosed to third parties unless lifting confidentiality is required to meet the ends of justice.") (citation omitted).

The *Figurski* court recognized that the requirements of disclosure under *Brady* and *Giglio* are a sufficient basis to require the disclosure of a PSR. 545 F.2d at 391. This is especially true, the Court noted, when that document pertains to a codefendant because "the testimony of such witness may be shaded to curry favorable treatment rather than premised upon an overriding concern for the truth." *Id.*

The court in *Figurski* adopted the test for disclosure articulated by the Supreme Court in *United States v. Agurs*, 427 U.S. 97, 112 (1976):

> If the report contains exculpatory material, that part of the report must be disclosed. If the report contains only material impeaching the witness, disclosure is required only when there is a reasonable likelihood of affecting the trier of the fact. Whether there is such a likelihood depends upon a number of factors such as the importance of the witness to the government's case, the extent to which the witness has already been impeached, and the significance of the new impeaching material on the witness' credibility.

545 F.2d at 392.

But that test only concerns whether the PSR should be disclosed, in part or in whole, to counsel for the defendant. The court held that a request alone was sufficient to require an *in camera* review by the district court to determine how much, if any, of the report should be

disclosed to defense counsel: "It follows that, *when requested* to exhibit such a report, the district court should examine it in camera and disclose only those portions, if less than all, of the report which meet the test we prescribe." *Id.* Empasis added. Based on *Figurski*, a defendant is not required to make an advance showing of materiality.

The *Figurski* standard for *in camera* review was affirmed by the Supreme Court in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987):

> We agree that Ritchie is entitled to know *whether* the CYS file contains information that may have changed the outcome of his trial had it been disclosed. Thus we agree that a remand is necessary. We disagree with the decision of the Pennsylvania Supreme Court to the extent that it allows defense counsel access to the CYS file. An *in camera* review by the trial court will serve Ritchie's interest without destroying the Commonwealth's need to protect the confidentiality of those involved in child-abuse investigations.

(Emphasis added).

The Fourth Circuit revisited the standard for requiring an *in camera* review in *United States v. Trevino*, 89 F.3d 187 (4th Cir. 1996). In an unusual decision subject to harsh criticism by the dissent, the majority found that *Figurski* had not set any standard for *in camera* review at all. *Id.* at 190. And the majority cited a footnote in *Ritchie* that seemingly required the defense to make some showing even before an *in camera* review could be required. *Id.* at 189.[2]

To the extent that *Trevino* is good law, the standard for requiring an *in camera* review of a PSR is easily met in this case. All that *Trevino* requires is "a plausible showing" that the PSR may contain favorable evidence material to the guilt or punishment of a defendant. " Once the accused has made a plausible showing that the evidence would be both material and favorable,

---

[2] *See Trevino*, 89 F.3d at 194 (Phillips, J., concurring and dissenting) (noting that the decision in *Firguski* setting the standard for an *in camera* review could not be overruled by a panel decision and pointing out that the language in *Ritchie* pertained to the question of compulsory process not the constitutional obligation to disclose favorable evidence under *Brady* and *Giglio*).

the trial court must review the information *in camera* to ascertain its true nature and determine whether it must be disclosed." 89 F.3d at 190.

There can be no serious question that King's PSR will contain material that can be used for impeachment purposes. But there may also be information in King's PSR that is exculpatory in nature and which could lead to the filing of a motion for a new trial.

And, with all due respect, Mr. Batten is represented by experienced trial counsel who, with an advocate's eye, may have a different view, if not a better understanding, than the Court as to how certain information can be used to Mr. Batten's benefit. As the Supreme Court has recognized, the roles of an advocate and the trial judge, even an experienced trial judge, are materially different:

> Nor is it realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. *The determination of what may be useful to the defense can properly and effectively be made only by an advocate.* The trial judge's function in this respect is limited to deciding whether a case case has been made for production, and to supervise the process.

*Dennis v. United States*, 384 U.S. 855, 874-875 (1966) (emphasis added).

The following sections of King's PSR present a fertile ground for the discovery of both exculpatory and impeachment evidence:

1. Mr. Batten should be permitted to review the "Pretrial Services Adjustment" section of the PSR. At last check, the Superseding Indictment against King has not been dismissed as the Government continues to hold the proverbial sword of Damocles over her head. The charges in that indictment carry a mandatory minimum sentence of ten years and a maximum of life in prison.

Should the Government, in its sole discretion, determine that King has stopped singing the appropriate song, it has the unfettered right to withdraw from the plea agreement. But King would still be bound by her guilty plea.

The offenses in the Superseding Indictment trigger a presumption in favor of detention. 18 U.S.C. § 3142(f)(1)(A), (B). Yet King is currently on a $25,000 unsecured bond. Mr. Batten is entitled to know what additional conditions, if any, have been required to secure her release, what changed the Government's mind from adamantly opposing a bond for King in August of 2022 to joining in a defense motion for bond in January of 2024.

2. Mr. Batten should be permitted to review the "Offense Conduct" section of the PSR to determine whether it is in accord with the Factual Basis provided by the Government to support King's guilty plea

3. Every PSR in this district has a section entitled "Impact of the Plea Agreement," generally found under the section entitled "Sentencing Options." This section of King's PSR will undoubtedly detail the benefits that King has received from her deal with the Government.

Mr. Batten anticipates that the information in this section will be favorable to his sentencing argument on sentencing disparity. And it may disclose information that was not made available to Mr. Batten during the trial of this case leading to the question of whether he is entitled to a new trial.

4. In accordance with Local Rule of Criminal Procedure 32.4, the Government was required to submit a "Statement of Relevant Conduct" providing, among other things, the "facts the Government believes support any agreed-upon offense level computations in the plea agreement" and "the facts warranting any non-agreed-upon Chapter 2 or 3 enhancements or reductions." Because there are no stipulations as to enhancements or reductions in King's plea

agreement itself, Mr. Batten is entitled to know the Government's position with respect to any applicable enhancements and any reductions that the Government or King's counsel recommended, by agreement or otherwise.

For example, has the Government recommended an enhancement for obstruction of justice based on King's false statements during her pretrial interviews and her false testimony during the trial itself. And has the Government sought the inclusion of a vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) as it did for Mr. Batten.

If those enhancements were not sought, what was the Probation Officer's determination as to their applicability. But the failure to seek those enhancements may also constitute impeachment evidence.

Moreover, although King pled guilty to a conspiracy under 18 U.S.C. § 371, as opposed to the conspiracy under 18 U.S.C. § 1594 alleged in the Superseding Indictment, the Sentencing Guideline for all conspiracy offenses provides that the base offense level is the "base offense level from the guideline for the substantive offense, plus any adjustments from such guideline." U.S.S.G. § 2X1.1(a). In short, King's Guidelines Offense Level should be the same as Mr. Batten's with the exception of King's reduction for acceptance of responsibility.

And given the similarity of the charges in King's Bill of Information and the Superseding Indictment, it will also be important to compare the Statement of Relevant Conduct with the assertions the Government made in opposing King's requests for bond prior to the trial of this case. It is virtually certain that the Statement of Relevant Conduct will provide valuable impeachment evidence as well as evidence to support Mr. Batten's sentencing disparity argument.

5.      The PSR also contains a section entitled "Victim Impact."  Based on the nature of her

plea, the minor who was purportedly sex trafficked would qualify as a victim of King's criminal

conduct.  Mr. Batten should be permitted to review any statements provided by the victim to

compare those statements to the victim's trial testimony.

6.      Again based on U.S.S.G. § 2X1.1(a), King's adjusted offense level should be the same as

Mr. Batten's, with the exception of the reduction for acceptance of responsibility.  Accordingly,

Mr. Batten is entitled to review the "Offense Level Computations" section of King's PSR.

7.      Mr. Batten has not been provided any information about King's prior criminal history.

The fact that she has prior convictions, particularly if they are related to her prostitution

activities, would be impeachment evidence disclosable under *Giglio*.

Similarly, the section of King's PSR titled "Other Criminal Conduct" and "Other

Arrests" may yield *Giglio* information.  Indeed, if King's PSR details prostitution related

conduct prior to 2001, that information could potentially be exculpatory and disclosable under

*Brady*.

8.      Finally, Mr. Batten submits that the entire "Offender Characteristics"  section of King's

PSR should be disclosed.  Mr. Batten is already privy to much information about King's family

and background and what she may have told the Probation Officer might be inconsistent with the

truth.  Other portions of that section, including the "Mental and Emotional Health"  and

"Substance Abuse" sections will undoubtedly provide valuable impeachment evidence.

In short, Mr. Batten submits that he has provided more than a plausible showing that

King's PSR contains disclosable information sufficient to trigger the requirement for an *in*

*camera* review of the report under the test set out in *Travino*.  But Mr. Batten further submits that

he is entitled to have his counsel review the report in its entirety with an "advocate's eye" to the usefulness of the information contained therein.

B.    <u>Mr. Batten is entitled to review King's sealed motions for bond as well as all sealed orders either denying the motions or setting the conditions for her release</u>

Like King's PSR, her motions for bond and to review the conditions of her release were filed under seal. The basis for sealing the motions is unknown.

King first sought release on bond following her original indictment in July of 2022. During the detention hearing, King's attorney argued that the evidence would show that King believed the minor victim was over the age of 18. Dkt. No. 12, p. 16. Thus, King was arguing that she was actually innocent of the charge which is inconsistent with her ultimate admission of guilt in her plea agreement.

In August of 2022, King filed a motion for release on bond arguing that there were changed circumstances, filed in August of 2022. During the hearing on the motion, King's attorney argued more directly that King was innocent of the charge. Dkt. No. 17, p. 11.

Again, that claim is inconsistent with King's subsequent guilty plea. If she repeated and perhaps embellished that claim in her motion which is likely, that inconsistency would provide, at a minimum, impeachment evidence. Using *Travino* as a guide, Mr. Batten has made a plausible showing that the sealed motion must at least be reviewed by the Court *in camera* to determine whether it contains *Brady* or *Giglio* information that must be turned over to the defense.

In January of 2024, King filed a second motion for bond. That motion was also filed under seal. Although the Government did not file a formal response, it would appear that the Government did not oppose the motion because King was released under a $25,000 unsecured bond with other unknown conditions.

What is in that motion that caused the one hundred eighty degree turnaround by the Government. Whether the information in that motion is inconsistent with King's guilty plea, it is clearly inconsistent with the Government's view of King's role in the alleged conspiracy with Mr. Batten back in July and August of 2022.

Accordingly, Mr. Batten submits that he has again made a sufficient showing that the motion and Orders may contain favorable and material evidence that this Court should at least review the motion to determine whether it should be disclosed to Mr. Batten.

C,      <u>Mr. Batten renews his motion for the disclosure of each of the items listed in subparagraphs C through J at pages 1-2 above.</u>

Mr. Batten was notified that King had signed a plea agreement to a charge of conspiracy under 18 U.S.C. § 371 but a copy of the plea agreement was not provided until her plea of guilty to the Bill of Information was entered on November 9, 2023. Dkt. Nos. 5.

Mr. Batten was subsequently provided with a copy of an expert report by Dr. Raghavan. In that report, Dr. Raghavan offered her expert opinion, based on her interviews with King less than three months prior to the entry of her guilty plea, that King was an innocent victim and not an "accomplice" in Mr. Batten's crime of sex trafficking an underage female.

What changed between August 22, 2023 when King managed to persuade a trained psychologist of her innocence and November 8, 2023 when King signed up for the deal of a lifetime with the Government? Indeed, the time between Raghavan's interview with King and her acknowledgement of guilt is even shorter than those dates.

Common sense and past experience establish that King's plea agreement and the Factual Basis that accompanied it were not created in a vacuum or produced, executed, and filed on or within one day of when they were drafted. A deal taking a defendant from a sentence of a

mandatory minimum of ten years to life down to a maximum sentence of five years could not have been made without some level of supervisory approval in the US Attorney's Office.

Indeed, a deal of that significance probably required the approval of the US Attorney. Accordingly, on information and belief, there were negotiations between the Government and counsel for King for some period of time prior to the signing and filing of those documents. And we know there were discussions about the plea prior to the signing of the document based on the Government's acknowledgement that it had "informed [King's] attorneys *before her plea* that it was "open to considering a bond at the appropriate time."

All of the information now requested should have been provided to Mr. Batten in advance of the trial. But the Court ruled that the defense "had enough" to impeach King based on her plea to a statute with a five year cap and denied the defense motion to disclose as moot.

But as the Supreme Court noted in *Dennis, supra*, "[t]he determination of what may be useful to the defense can properly and effectively be made only by an advocate." In any event, that evidence remains relevant to the question of the appropriate sentence.

Among the factors that the Court is required to consider in determining the particular sentence to be imposed is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A case involving more disparate treatment of two defendants who have been found guilty of similar conduct cannot be fathomed.

The allegations in the Bill of Information to which King pled guilty are indistinguishable from the language in the Superseding Indictment in which King was originally charged. Not similar - - exactly the same. Indeed, when the overt acts listed in the Bill of Information are

considered, the Bill of Information actually embraces all four charges against King in the Superseding Indictment.

We all know that the Government had to give away the farm to King to buy her testimony against Mr. Batten. But that is only a snapshot of the sentencing disparity in this case. What is more critical to the defense argument is whether the Government gave away the farm in a one fell swoop, or whether it was forced to give away the farm one acre at a time.

To be less cryptic, it is possible, even likely, that the Government offered a deal to say Count One of the Superseding Indictment and a sentencing recommendation of twenty-five years initially but was required to engage in additional negotiations and make other more attractive offers before finally reaching to the depths of the current deal. If so, the facts surrounding those negotiations and whatever other deals were offered before King finally agreed to plead guilty are important in demonstrating degree of disparity between King's potential sentence and Mr. Batten's.

It is anticipated that King will be called to testify during the sentencing hearing regarding the status of her agreement with the Government. After all, as Government Counsel made clear during his examination of King during the trial that if she did not tell the truth, her plea deal "goes away" and she would be looking at "more time."

During the trial, King acknowledged that she had lied during her interview with the FBI. FBI Agent Brown reluctantly conceded that King lied a second time during her pretrial interview with Government Counsel. And King herself admitted that she had lied under oath during her direct testimony at the trial.

If the Government has refused to enforce the penalty explicitly set out in the plea agreement, that is to terminate the agreement based on King's lies, that refusal is yet another

unwarranted benefit King has received from the Government.  And that additional benefit simply serves to make the sentencing disparity between what King is likely to receive and what Mr. Batten is facing even more pronounced.

Mr. Batten submits that the materials he is seeking will provide this Court with ample justification to grant a downward variance from Mr. Batten's Sentencing Guidelines range to impose a sentence that is fair and just under the circumstances.  Mr. Batten recognizes that this Court has no power to undo the Government's unprecedented leniency toward King but it can at least provide a modicum of fairness for Mr. Batten.

Mr. Batten's entitlement to such materials is well established.  As noted in the Magistrate's Order under the Due Process Protection Act, Mr. Batten is entitled to **all** evidence which is either favorable to him or which casts doubt on the Government's case.  King, now that she has received the benefit of a sweetheart deal that takes her sentencing exposure from life to a maximum of five years, was undoubtedly the star of the Government's case.

Discrediting King will be essential to Mr. Batten's ability to achieve a fair and just sentence for crimes King now claims she conspired to commit with Mr. Batten in an effort to secure her favorable deal with the Government.  Indeed, as recently as October 30, 2023, King was still proclaiming her absolute innocence.  *See* Report of Psychological Evaluation by Chitra Raghavan, PHD, p. 2:  "It is further my professional opinion to a reasonable degree of psychological certainty that Ms. King was a casualty of Mr. Batten's violence and exploitation, and a pawn in his alleged sex trafficking activities *rather than an accomplice*."  (Excerpt of 22-page report attached hereto as Exhibit 1) (emphasis added).

What King told her attorney prior to her entry into a plea agreement with the Government would appear to be totally inconsistent with the song she sang at trial with an unprecedented

safety net provided for her music sheet. And such inconsistent statements must be disclosed under *Brady* and its progeny. *See Spicer v. Roxburty Correctional Institute*, 194 F.3d 547, 557 (4th Cir. 1999) (failure to disclose a statement made by a witness to his defense attorney which was inconsistent with the statement the witness made to the Government would have provided valuable impeachment evidence and the failure to disclose the statement was a violation of *Brady* and required a new trial for the defendant).

Similarly, what King told Dr. Raghavan to persuade the psychologist that King was innocent of the charges in the indictment will necessarily be inconsistent with her claim that she committed the crimes charged as a coconspirator with Mr. Batten. *See United States v. Carter*, 313 F. Supp. 2d 921, 926 (E.D. Wis. 2004) ("Because the statement Alston made to the psychologist was inconsistent with other statements he made both before and after the competency evaluation, it was useful to the defense in impeaching his credibility." *See also Ritchie*, 480 U.S. at 58 (notwithstanding the sensitivity of the information, defendant was entitled to have the trial court review confidential materials from the state's Children and Youth Services file *in camera* to determine whether the file contained any *Brady* or *Giglio* materials that would have been useful to the defendant during his trial).

It is well-recognized that during the negotiations leading up to a plea agreement, "it is possible, maybe even likely, that the witness's proposed testimony that was proffered at the beginning of the process differed in some respects from the testimony proffered at the end of the process." *United States v. Sudikoff*, 936 F. Supp. 2d 1196, 1202 (C.D. Cal. 1999). And although those variations could be nothing more than the nature of the process, it is equally plausible that the differences are based on an accomplice's "tendency to embroider the truth." *Id*. Accordingly, "any variations in an accomplice witness' proposed testimony, from earlier statements made to

authorities, could be considered favorable to the defense and the existence of such differences should be disclosed under *Brady*." *Id.*

Moreover, it is not just the possible inconsistencies in an accomplice witness's statements that might lead to evidence with which the accomplice can be impeached. As the Court in *Sudikoff* noted, the negotiation process itself, which leads ultimately to an agreement and a promise of leniency, is proper fodder for challenging the veracity of the accomplice's testimony. "Thus, the Court concludes that information that reveals the process by which an accomplice witness and the government reach a leniency agreement is relevant to the witness's credibility because it reveals the witness's motive to testify against the defendant. Therefore, such information is discoverable under *Brady* and *Giglio.*" *Id.* at 1203. *See also United States v. Buske*, 2011 WL 2912707 *4 (E.D. Wis. July 18, 2011) (Government required to disclose all proffers by any witness in return for leniency including those made by or through attorneys for the witnesses, as well as any information that "revealed the negotiation process" including materials "authored by a witness, a witness's lawyer, or the government.").

The compelling need for the disclosure of the information requested here is proved by the extent of the leniency provided to King by the Government in return for her testimony. Based on the charges in the original indictment, King faced a mandatory minimum sentence of ten years to life on three of the counts and a sentence of up to life imprisonment on the fourth. Thus, her minimum sentence on three of the four counts would have been twice what she currently faces.

But the Sentencing Guidelines would have made even a ten-year sentence seem like a gift. Her base offense level for any of the counts in the indictment would have been (and remains, as discussed below) Level 30. U.S.S.G. § 2G1.3(a)(2). Enhancements would

unquestionably be applied for use of a computer two levels, § 2G1.3(b)(3). . Other probable enhancements include using undue influence (2 levels, § 2G1.3(b)(2)(B)), vulnerable victim (2 levels, § 3A1.1(b)(1), and repeat and dangerous sex offender against minors (5 levels, § 4B1.5(b)).

And although King has pled guilty to a conspiracy under 18 U.S.C. § 371, all of the enhancements that would have been applicable if she had pled to the conspiracy under 18 U.S.C. § 1594, Count One of the original Indictment, are applicable to the charge to which she has pled guilty. *See* USSG § 2X1.1(c)(1) ("When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section.")

Thus, had she been convicted of, or pled guilty to, the conspiracy charge in the indictment rather than the conspiracy charge in the Bill of Information, King would have been facing a minimum Guideline Offense Level of 34 and more probably an offense level of 41. Depending on her Criminal History Category, King would have been facing as much as thirty years to life in prison.

Interestingly, not one of those enhancements that would or might have been applied if King had pled guilty to one of the charges in the original indictment is identified, let alone agreed to or even recommended by the Government in King's plea agreement. Not one. As if the parties to the agreement believe those enhancements will disappear if they do not mention them.

But regardless of what the Sentencing Guidelines would recommend for King's offenses, the very highest sentence that King can now receive is five years. And a maximum sentence is not likely given the probability that King will benefit from a motion to further reduce her sentence based on her "substantial assistance" to the Government by virtue of her testimony

against Mr. Batten. If saving herself from a life sentence, getting the protection of a five-year cap, and having hope for further largess from the Government is not an inducement to provide false testimony, it is hard to imagine what more King could have asked for with a straight face.

Except, perhaps, a binding agreement by the Government to stick to the terms of this sweetheart deal. And therein lies the rub and the reason to distrust King's testimony.

In one of the first paragraphs in her plea agreement, the Government warns that King's "failure to fully comply with any provision of the Plea Agreement" constitutes a breach of that agreement. Case No. 3:23-245-RJC, Dkt. No. 2, para. 3. And the penalty if the Government determines that King breached the agreement? The Plea Agreement makes the danger of having the Government determine that King breached the agreement very plain:

> In addition to any other remedy available in law, the defendant's breach:
> (a) *will relieve the United States of its obligations under the Plea Agreement*, without relieving the defendant of the defendant's obligations under the Plea Agreement or permitting the defendant to withdraw the guilty plea; (b) may constitute the defendant's failure to accept responsibility under U.S.S.G. § 3E1.1; and (c) *will permit the United States to proceed on any dismissed, pending, superseding or additional charges* and, if applicable, any Information pursuant to 21 U.S.C. § 851.

*Id.*, para. 4 (emphasis added).

And while the agreement states that all of the provisions of the agreement are material terms, two full pages of the agreement are devoted to what King must do to earn a further reduction from the five years she is facing. And two things in those two pages stand out.

First, the determination of whether King has provided substantial assistance is solely within the discretion of the Government. Para. 25.a. In other words, if the Government does not

believe that King has sung on key, it can withhold a motion for a reduced sentence[3]  At this

stage, it is established that King lied under oath at trial.  Whether the Government will withhold

the motion for substantial assistance is yet to be seen.

And second, if the Government determines that King has knowingly given false

information or testimony, the Government "may" consider that conduct to be a breach of Kings

plea agreement.  Para. 22.e.  But the Government has shown no indication that it is willing to

impose the ultimate penalty called for by the plea agreement,  holding King's feet to the plea of

guilty but withdrawing the benefits  she would receive under that agreement.  Indeed, since the

trial of this case, the Government has joined in a defense motion to allow King to remain out on

bond, despite the fact that the presumption of detention still remains because the Superseding

Indictment has not been dismissed.

Thus, regardless of what she may have told her lawyer in the past, and regardless of what

she may have told Dr. Raghavan, King is now locked into the current story she is telling the

Government.  Otherwise, she runs the risk that her sweetheart deal suddenly evaporates as

quickly as it was conceived.

And that is why Mr. Batten needs, no is entitled to, any other versions of the "truth" that

King has told before she struck her deal with the Government.  In short, Mr. Batten is entitled to

know how this sausage was made.

---

[3] Counsel for Mr. Batten wants to make clear that there is no intent to suggest that the
Government would ever knowingly allow King to testify falsely.  The Government necessarily
has its view of what the truth about Mr. Batten and King's current story fits comfortably with
that view.  Obviously, Counsel for Mr. Batten have a different view of the truth, especially when
it comes to King's testimony.  Although Mr. Batten was convicted, the jury's verdict says
nothing about its belief that King testified truthfully or falsely.

And, if as expected, King was offered a deal for twenty-five or thirty years, which she rejected, or any other deal that she rejected that was less attractive than the five-year cap she finally obtained from the Government, Mr. Batten is entitled to know what, if anything, King was led to believe would be the price for that ultimate prize. And so is the sentencing court in this case.

Wherefore, Mr. Batten respectfully requests the Court to order the Government to immediately produce and disclose each and every one of the items identified in subparagraphs C through J at pages 1 and 2 above.

## CONCLUSION

For each of the reasons stated above, Mr. Batten respectfully requests the Court to grant the instant motion and order the disclosure of the items identified above.

Respectfully submitted, this 13th day of January 2025.

/s_ *John J. Dowling III.*
John J. Dowling III.
NC Bar No. 57517
DOWLING DEFENSE GROUP LLC
101 N. McDowell St, Suite 200
Charlotte, North Carolina 28204
Ph: 631-574-7905
E: john@dowlingdefensegroup.com

/s *David A. Brown, Sr.*
David A. Brown, Sr.
NC Bar No. 48997
DABROWNLAW LLC
360 Rosemore Place
Rock Hill, SC 29732
Ph: (704) 654-9418
E: dabrownsr79@gmail.com

*Attorneys for Defendant Tawaan Batten*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to this Court's standing order dated June 18, 2024, *In re Use of Artificial Intelligence*, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at my direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/  John J. Dowling III.*
John J. Dowling III.

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing Motion to Disclose on this 13th day of January 2025 with the Clerk of Court by using the CM/ECF system, which will send notification of such filing to all parties to the case.

/s/ David A. Brown,
Sr. David A. Brown
N.C. Bar No. 48997